Filed 3/24/16  P. v. Irwine CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>FRANK IRWINE et al.,<br><br>Defendants and Appellant. | A141008<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT]**<br><br>(Alameda County<br>Super. Ct. Nos. C170037A, C170037B) |

**THE COURT:**[*]

IT IS ORDERED that the opinion filed on February 26, 2016, is **modified** as follows:

---

[*] Before Simons, Acting P.J., Needham, J., and Bruiniers, J.

1

1.  On page 5, in part I.A.3., delete the fifth paragraph and replace it with the following:

    > Sergeant Arotzarena collected a DNA sample from Dailey.  Although the officers had not informed Dailey that Shavan had been shot, Dailey volunteered, "Give me a GSR [gunshot residue] test."

2.  On page 44, in part II.H.2., in the first full paragraph, delete the seventh sentence and replace it with the following:

    > Dailey also knew to go to the area in East Oakland where Shavan's body was found, on the morning of her death; and he spontaneously told police he would take a gun residue test, even though police had not disclosed to him the manner in which she was killed, he had claimed to police that he did not even know she *had* been killed, and he never indicated that he learned the manner of her death from the media.

The modification effects no change in the judgment.

The petition for rehearing is DENIED.

Date:_____                    _____Acting P.J.

2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>FRANK IRWINE et al.,<br><br>        Defendant and Appellant. | A141008<br><br>(Alameda County<br>Super. Ct. Nos. C170037A, C170037B) |

Frank Irwine and Kristian Dailey appeal from a judgment of conviction and sentence imposed after a jury found them guilty of first degree felony murder with a special circumstance.  (Pen. Code, §§ 187, 189, 190.2.)  In essence, the prosecutor had urged that Dailey and Irwine committed—directly or as aiders and abettors—a robbery of the victim at an ATM, rape and forcible oral copulation of the victim, and ultimately the killing of the victim at another location.

Irwine contends the trial court erred because a jury instruction regarding aiding and abetting conflicted with an instruction pursuant to CALCRIM No. 703 pertaining to special circumstances.  Dailey contends (1) there was insufficient evidence of felony murder because there was no causal and temporal connection between the ATM robbery and the killing; (2) the court's instructions on felony murder (particularly CALCRIM Nos. 540B and 549) were incorrect and misleading; (3) the court inadequately responded to a jury inquiry about the meaning of "while committing" in the context of CALCRIM No. 540B, which requires for felony murder that the killing be perpetrated while a participant was committing the felony; (4) the court did not instruct sua sponte on second

1

degree murder, even though the accusatory pleading included the phrase "with malice aforethought"; (5) the court failed to instruct sua sponte on intervening and superseding causes; (6) the court should have admonished the jury when the prosecutor said Dailey and Irwine had a motive to commit robbery due to their unemployment; (7) there was no substantial evidence to support the special circumstance of robbery because Dailey did not display reckless indifference to human life and was not a main participant in the crime; (8) no substantial evidence supported the robbery special circumstance due to the lack of nexus between the ATM robbery and the killing; (9) the instruction on special circumstances did not properly define "reckless indifference to human life"; and (10) the cumulative effect of these errors mandates reversal.

We will affirm the judgment.

## I. FACTS AND PROCEDURAL HISTORY

An amended information charged Irwine, Dailey, and Terrance Anderson (Anderson) with the murder of Shavan Boone (Shavan).[1] (Pen. Code, § 187.)[2] The information also alleged special circumstances of robbery, rape, sodomy, and forcible oral copulation as to each defendant. (§ 190.2, subd. (a)(17).)

Anderson's case was severed, and trial by jury commenced against Irwine and Dailey. The prosecutor pursued only a theory of felony murder.

### A. Prosecution Evidence at Trial

Shavan was a petite young woman, approximately 20 years old, weighing about 110 pounds. Around 6:30 p.m. on November 1, 2006, she left her son in the care of a neighbor (Nelson), saying she was going out to meet someone. At 7:49 p.m., when Nelson did not hear from Shavan, she became concerned and left a message on Shavan's

---

[1]     For clarity and consistency, without disrespect, we refer to the victim by her first name, as do the briefs of Dailey and respondent and the majority of the references in the record.

[2]     Unless otherwise indicated, all further undesignated statutory references are to the Penal Code.

2

cell phone.  Nelson later received a text message from Shavan's phone, saying she was on her way.  Nelson did not hear from Shavan again and called police.

### 1. Discovery of Shavan's Body

On November 4, 2006, Shavan's lifeless body was discovered in a recycling bin in a dry creek bed on the 5700 block of Trask Street in East Oakland.  She was covered by, or wrapped in, a blanket.  No personal belongings, such as a purse or cell phone, were found on or near her body.  Rigor mortis had set in.

An autopsy determined that Shavan had been shot in her neck, there was stippling around the entrance wound, the bullet severed her spinal cord, and the wound was consistent with that produced by a small-caliber firearm.  Shavan died from the gunshot wound sometime on November 2, 2006.

### 2. Evidence of Shavan's ATM Transaction on November 2

Police learned that Shavan had withdrawn $80 from a Wells Fargo ATM at 2:05 a.m. on November 2, 2006, near 12th and Broadway Streets in the City Center area of downtown Oakland.

A surveillance video of the ATM depicted Shavan making the transaction, with two men—Dailey and Anderson—near her.  One of the men (Dailey, according to the police and prosecutor) had his arm around Shavan's neck.  Shavan appeared to be crying.  She handed the money to one of the men (probably Anderson), although the actual exchange could not be seen because the video skipped every few seconds.

### 3. Police Interview of Dailey

Police arrested Dailey on March 13, 2007, wearing the same jacket that he wore in the ATM video.  Oakland Police Sergeant Dominique Arotzarena and Sergeant Louis Cruz interviewed Dailey after he waived his *Miranda* rights.  (See *Miranda v. Arizona* (1966) 384 U.S. 436).

When shown Shavan's photograph, Dailey denied knowing her.  Then he said he might have seen her years earlier in Pittsburg but did not know her name.

3

Later in the interview, Dailey remembered meeting Shavan, maybe three months previously, around 11:00 p.m. one night with two men. One of the men he knew as " 'Bama" (a nickname for Irwine), a muscular man about 5 foot 11 inches tall; the other man was slightly shorter with a darker complexion (Anderson), whose name Dailey did not know.

According to Dailey, Shavan and Anderson joined Dailey at a bus stop at 14th and Broadway. Dailey was not consistent as to whether Irwine was at the bus stop as well, but there was discussion about Irwine being nearby and having or using a Taser. Dailey confided that Irwine and Anderson "obviously [had] some type of control over" Shavan.

At some point, Dailey and Shavan went to a Wells Fargo Bank ATM on 12th Street. Dailey acknowledged that he was depicted in the ATM surveillance photograph. He knew that Shavan "might've had a EBT card" and might not have been able to access her money until after midnight. When Anderson saw that Dailey and Shavan were going to the ATM (or when he observed Shavan getting the money), he approached and grabbed Shavan's neck. Irwine joined them as well. Shavan then left with Irwine and Anderson, while Dailey remained at City Center.

Dailey claimed that Shavan had decided to get money from the ATM because prostitutes "pay the—the men that they deal with, whether it be a pimp—I don't know what it is. . . . [¶] They take money from some men and they pay others." Alternatively, he stated: "Or maybe if she got some money—you know what I mean—she'd be more of an asset or valuable to them for whatever reason." Dailey indicated that Shavan was a prostitute.[3]

Shavan, Irwine, and Anderson returned in two or three hours, and Shavan "looked scared." Dailey "believe[d] that they had [had] sex." He added: "She probably didn't really want it, but she probably didn't say nothin' really about it. You know what I mean?" Shavan, Irwine, and Anderson hung out with Dailey for about half an hour between 2:00 and 3:00 a.m., and then left.

---

[3]     Additional evidence was presented that Shavan was a prostitute.

4

Dailey claimed that he, however, stayed in City Center until around 6:00 a.m., when he took the "43 bus" to 61st and Shattuck Streets (near the Oakland-Berkeley border) to go to his girlfriend's home, where he remained. He denied going to East Oakland.

Because Dailey had observed Shavan "in a situation that did not look good," he called her that morning to check on her. When police confronted Dailey with how he knew her phone number, Dailey said that he actually "might have met her a couple of days *before*" he saw her at the bus stop with Irwine and Anderson. (Italics added.)

Dailey confirmed that his cell phone number was 510-688-5558. Records showed the caller I.D. for his cell phone was "Chris Pimpme." When police asked Dailey about the reference, he did not want to discuss it. He claimed it was just a name, and although he wanted "certain things to appear on my Caller ID," it did not "mean that I live that way."

Dailey denied any knowledge of Shavan's death. He denied witnessing any crimes. Although initially saying he might have had a cell phone that night, he ultimately denied having a cell phone.

Sergeant Arotzarena collected a DNA sample from Dailey. Although the officers had not informed Dailey that Shavan had been shot—and the information had not been released to the media—Dailey volunteered, "Give me a GSR [gunshot residue] test."

4. DNA Analysis Linking Irwine and Anderson to Sex With Shavan

DNA analysis was performed on vaginal, rectal, and oral swabs of Shavan's body. The vaginal swab showed one male sperm donor and one female donor. The rectal swab had a major male sperm donor whose DNA matched the DNA on the vaginal swab. The oral swab revealed a single-source male profile that also matched the vaginal swab. Irwine could not be eliminated as the donor to these swabs: one in 36.9 trillion people fit the profile.

5

The blanket recovered with Shavan's body had a number of stains, one of which contained sperm with a DNA different from that found on the swabs. Anderson could not be eliminated as the donor; only one in 237 billion people fit this profile.

Dailey was eliminated as a donor to the swabs and blanket.

### 5. Recycling Bin Linked to Anderson

A gray recycling bin was reported missing from an apartment complex at 2312 55th Avenue in Oakland on November 15, 2006. Anderson lived at that address. It was a short walk from that address to the creek bed where Shavan's body was recovered. The serial number of the recycling bin in which Shavan was found was consecutive to the serial number of the recycling bin next door to Anderson's address.

### 6. Irwine's Other Armed Robberies

Evidence indicated that on October 27, 2006, Irwine and another culprit robbed an individual outside a check-cashing business in East Oakland around 2:00 a.m.; Irwine was armed with a revolver and struck the victim on the head. Additional evidence indicated that on November 27, 2006, Irwine helped to perpetrate a robbery near a Western Union office in East Oakland using a gun. Irwine entered a plea of no contest to the armed robbery on October 27, 2006; as a result of his plea, the charge for the November 27 robbery was dismissed.

### 7. Interviews of Irwine

Irwine was arrested on March 29, 2011. Inspector Gus Galindo of the Alameda County District Attorney's Office advised Irwine of his *Miranda* rights, and Irwine agreed to speak with him. A videotape of the interview was played for the jury.

Irwine confirmed his nickname was 'Bama and acknowledged his cell phone number. Irwine was shown a photograph of Dailey, but denied knowing him. Irwine was shown a photograph of Anderson, but denied knowing him (except for being arrested *with* Anderson for the armed robbery Irwine allegedly committed in November 2006). Irwine denied hanging out with Anderson.

Irwine also denied knowing Shavan, both before and after he was shown her photograph. Irwine maintained, "[T]here's no way I know her." He repeatedly insisted he could not remember her, despite being told that his DNA was found in her body and phone records showed they called each other.

Deputy District Attorney Ursula Dixon and Inspector Cory White then interviewed Irwine, from March 29, 2011, into the morning hours of March 30, 2011. The videotape of the interview was played for the jury.

Initially, Irwine continued to assert that he did not know Shavan. Later, he suddenly remembered Shavan by the nickname "Money."

Irwine claimed that he met Shavan when she approached him at an "African bookstore" at 14th Street and Broadway in Oakland in the beginning of November, where he would "sit in there and read they books in there." He gave his name as 'Bama; she gave her name as Money. They exchanged phone numbers, and she left for West Oakland. Later that day, she called and wanted to spend time with him; because she did not know her way around Oakland, he walked to the area of 18th and Grand to meet her, while talking with her on his cell phone. They returned to City Center and had sex behind a store. Irwine remembered that he had not used a condom, and they had had only vaginal sex because she refused to have oral sex. They then went their own ways: she walked toward West Oakland, while he went home. Irwine denied seeing Anderson or Dailey that night, and he denied seeing Shavan go to an ATM.[4]

### 8. Irwine and Dailey's Cell Phone Records for November 1 and 2

An expert in cell phone call detail records and cell phone tower data analyzed the cell phone records for Shavan, Dailey ("Chris Pimpme"), Irwine ("Bama, Bama"), and Anderson. Although Irwine had denied knowing Anderson at the time, cell phone

---

[4] Shavan's sister confirmed that Shavan's nickname was Money. An investigator testified that the word "money" was tattooed on Irwine's right bicep. The prosecutor contended in closing argument that, after robbing Shavan, forcing her to orally copulate him, executing her, and disposing of her body, he had her nickname tattooed on his arm as a trophy.

7

records indicated that he and Anderson called each other 43 times between October 31 and November 5, 2006, around the time of Shavan's death and weeks before he and Anderson were allegedly involved in the armed robbery outside a financial institution.

The last call from Shavan's phone was placed at 2:09 a.m. on November 2, 2006, a few minutes after her ATM withdrawal. At that time, her phone activated cell tower 4024 in Oakland City Center. Although incoming calls were placed to her phone after that, her phone did not register a cell tower; the inference was that Shavan's phone had been turned off.

Cell phone records for Dailey, Irwine, and Anderson showed that their cell phones also activated cell tower 4024 in Oakland City Center around the same time as Shavan's ATM withdrawal and final phone call.

The records further indicated that Irwine's and Anderson's cell phones were then turned off for several hours: Irwine's phone did not register a tower from 3:08 a.m. to 8:16 a.m., and Anderson's phone did not register a tower from 2:13 a.m. until 7:21 a.m.

Although cell phone records indicated that Dailey remained in Oakland City Center until approximately 7:00 a.m. on November 2, 2006, his phone registered cell tower 2043 in East Oakland at 7:38 a.m. that day—contrary to his assertion that he had gone to his girlfriend's house in north Oakland. This was the only indication of Dailey being in that East Oakland area during a five-day period.

B. Prosecutor's Arguments

In closing argument, the prosecutor urged that Dailey and Irwine were each guilty of first degree felony murder with special circumstances. She argued that, in light of Irwine's and Dailey's prevarications, deflections, and demeanor in their interviews with police, their accounts should be largely rejected and the actual events pieced together from their inadvertent admissions, the cell phone records, and other objective and physical evidence.

8

1. <u>Argument as to Irwine</u>

The prosecutor contended that Irwine was guilty of felony murder with special circumstances because of his participation in her robbery, rape, and forcible oral copulation.

As to robbery, the prosecutor argued that Irwine aided and abetted the crime because he was near the ATM when Dailey and Anderson forced Shavan to withdraw money, one of the perpetrators had a gun (since Shavan was later shot) and Irwine specifically had a gun (because he had used a gun in other robberies with a common plan, occurring outside a financial institution at night against a vulnerable victim). In addition, the prosecutor argued, Irwine robbed Shavan of her backpack, cell phone, wallet, and cash at a later time because those items—although they appeared in the ATM video— were not found with her body.

As to rape and oral copulation, the prosecutor argued that Irwine was the direct perpetrator because his DNA was found in Shavan's vagina and mouth, and the oral copulation was nonconsensual because he admitted to police that Shavan said "she wouldn't do oral."

The prosecutor asserted that Irwine (or Anderson) killed Shavan, noting Dailey's statement that Shavan left with Irwine and Anderson, Irwine's cell phone records indicated that he left downtown Oakland (where the ATM robbery occurred) in the direction of East Oakland (where Shavan's body was found) at approximately 2:35 a.m.; a bus that left downtown Oakland at 2:35 a.m. would have dropped off Shavan, Irwine, and Anderson in East Oakland in the area around Anderson's house before 3 a.m., which explained why Irwine's cell phone activated a cell tower there; and the recycling bin containing Shavan's body was from Anderson's address. In addition, less than a month after Shavan was shot with a small-caliber gun, Irwine and Anderson used such a gun in the commission of an armed robbery.

According to the prosecutor, the killing of Shavan occurred in the commission of the robbery: there was a logical connection between the crimes because the victim in

9

both cases was Shavan; and the crimes occurred in one continuing transaction because Shavan remained under the control of the perpetrators from the time of the ATM robbery.

The prosecutor also noted the incriminating nature of Irwine's lies to the police. Irwine denied knowing Shavan, Dailey, or Anderson; when confronted with evidence, he made up a story that was inconsistent with the physical evidence and cell phone records. Irwine lied about not having had oral sex with Shavan because he knew it was not consensual. Irwine lied about where he was on November 2, 2006, because he murdered her that day in East Oakland.

### 2. Argument as to Dailey

The prosecutor argued that Dailey was also guilty of felony murder with special circumstances based on the robbery, rape, and forcible oral copulation of the victim.

As to the robbery, the prosecutor contended Dailey was the direct perpetrator because the ATM video showed Dailey's arm around Shavan's neck as she was withdrawing money, there was fear on Shavan's face, no one would voluntarily let anyone stand as close as Dailey and Anderson were while conducting an ATM transaction, Dailey knew she was using an EBT card rather than an ATM card, and the $80 withdrawal was completely out of Shavan's character based on her history of making much smaller point-of-purchase transactions.

As to rape and forcible oral copulation, the prosecutor argued that Dailey was responsible as an aider and abettor because (1) Dailey was a pimp, as shown by his cell phone caller I.D. of "Chris Pimpme," which he refused to discuss with police; (2) Shavan was a prostitute and Dailey's asset; (3) Dailey made Shavan go with Irwine and Anderson to have sex against her will (either as her pimp or simply because she was under the control of all three perpetrators), and he had expressed to police that Shavan did not want to have sex with Irwine and Anderson; and (4) Dailey must have set up the sexual encounter between Shavan and Irwine and Anderson because he would not have otherwise known that it occurred.

10

As set forth *ante*, the prosecutor contended there was a logical connection between the ATM robbery and Shavan's murder, which were all part of one continuous transaction in which Shavan remained under the control of Dailey, Irwine, and Anderson.

The prosecutor further pointed to Dailey's lies. Dailey denied knowing Shavan, Irwine, or Anderson; when confronted with evidence, he lied about where he had been at that time. He lied about Anderson holding Shavan's neck, because he knew that he was the one who had put his arm around her neck during the robbery. Dailey lied about not being in East Oakland on the day of Shavan's death, because he knew she had been murdered in East Oakland. Indeed, a bus schedule showed that Dailey could have left downtown Oakland to arrive by 7:38 a.m., where his cell phone activated a cell tower near Shavan's dead body.

C. Verdict and Sentence

On September 30, 2013, after the prosecution had dismissed the sodomy special circumstance, the jury found Irwine and Dailey guilty of felony murder in the first degree, found true the special circumstance of forcible oral copulation as to Irwine, found true the robbery special circumstance as to Dailey, and found the remaining special circumstance allegations not true.

The court sentenced both Irwine and Dailey to state prison for a term of life without the possibility of parole.

Irwine and Dailey thereafter appealed.

II. DISCUSSION

To provide context for the parties' arguments, we first revisit some well-established principles related to felony murder, as relevant to the issues at hand.

The perpetrator or aider and abettor of a felony may be liable for felony murder if, during the commission of the felony, an innocent victim is killed. For the felony-murder rule to apply, however, there must be a causal and temporal nexus between the felony and the killing. Essentially, the causal nexus is satisfied if there is some logical relationship between the felony and the killing; the temporal nexus is ordinarily satisfied if the felony

11

and the killing are part of one continuous transaction.  (*People v. Cavitt* (2004) 33 Cal.4th 187, 208 (*Cavitt*); see *People v. Wilkins* (2013) 56 Cal.4th 333, 344-345 (*Wilkins*).)

If the killing is committed in the perpetration of a felony that is specified in section 189—such as robbery, rape, or forcible oral copulation—it is felony murder of the first degree.  (§ 189.)  CALCRIM Nos. 540A and 540B address elements of the proof necessary for felony murder in the first degree, depending on whether or not the defendant was the actual killer.

If the jury finds the defendant guilty of felony murder in the first degree, it must then decide whether a special circumstance has been proven for purposes of punishment; a special circumstance finding will mean the defendant receives a penalty of death or imprisonment for life without the possibility of parole.  (§ 190.2.)  One special circumstance, relevant here, is that the murder was committed "while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit" a specified felony, such as robbery, rape, or forcible oral copulation.  (§ 190.2, subd. (a)(17).)  Thus, in some cases, where a defendant has perpetrated a robbery that had a sufficient causal and temporal nexus to a killing, the robbery may support both a finding of felony murder in the first degree and a finding of a special circumstance.

However, if the defendant is guilty of first degree murder (under CALCRIM Nos. 540A and 540B) but was *not the actual killer* (or the jury is unable to determine the actual killer), the special circumstance cannot be found unless (1) the defendant intended to kill; or (2) the defendant's participation in the felony began before the killing, the defendant was a major participant in the crime, and the defendant acted with reckless indifference to human life when participating in the crime.  (See § 190.2, subds. (c) & (d); *People v. Estrada* (1995) 11 Cal.4th 568, 572 (*Estrada*); CALCRIM No. 703.)

With these principles in mind, we turn to the parties' contentions.

12

A.  CALCRIM No. 401 and CALCRIM No. 703

Irwine contends that the trial court instructed the jury with an erroneous combination of a modified version of CALCRIM No. 401 (aiding and abetting an underlying felony), which Irwine proposed, and CALCRIM No. 703 (proof required for a special circumstance finding when the defendant was not the actual killer), to which he made no objection.  His argument has no merit.

1.  The Court's Instructions

We begin by setting forth relevant excerpts from the two instructions.

a.  *Aider and Abettor*

Because the prosecutor's theory was that Irwine was an aider and abettor with respect to the ATM robbery, but a direct perpetrator of rape and forcible oral copulation, Irwine proposed, and the trial court read, a modified version of a standard CALCRIM instruction pertaining to aiding and abetting (hereafter Modified 403), which emphasized that Irwine could be found to have committed rape or forcible oral copulation only as a direct perpetrator.[5]  The instruction read in part:  "With respect to defendant Frank Irwine, this instruction regarding aiding and abetting applies only to his role in the robbery allegation, but not the rape and forcible oral copulation allegations, where he is alleged to be the direct perpetrator."  It then discussed aiding and abetting principles with respect to the robbery allegation.

b.  *Nonkiller Special Circumstance (CALCRIM No. 703)*

Based on CALCRIM No. 703, the court instructed the jury that, to find a nonkiller defendant liable for a special circumstance, the prosecutor would have to prove that the defendant intended to kill or acted with reckless indifference to human life as a major participant in the crime.  (See *Estrada*, *supra*, 11 Cal.4th at p. 572.)  As relevant here, the court instructed:  "If you decide that a defendant is guilty of first degree murder, but was not the actual killer, then when you consider the special circumstances of robbery and/or

_____

[5]      Irwine refers to the instruction as a modified version of CALCRIM No. 401. Actually, it was a modified version of CALCRIM No. 403.

13

rape and/or forcible oral copulation, you must also decide whether the defendant acted either with the intent to kill or with reckless indifference to human life. [¶] In order to prove these special circumstances *for a defendant who is not the actual killer, but who is guilty of first degree murder as an aider and abettor*, the People must prove either that the defendant intended to kill or the People must prove all of the following: [¶] One, the defendant's participation in the crime began before or during the killing; two, the defendant was a major participant in the crime; and three, when the defendant participated in the crime, he acted with reckless indifference to human life." (Italics added.)

### 2. Irwine's Argument

Irwine argues that, because Modified 403 informed the jury that aiding and abetting principles did *not* apply to Irwine as to the alleged sex offenses, the instruction effectively negated the CALCRIM No. 703 requirement that a defendant guilty of first degree murder "as an aider and abettor" requires proof that the defendant intended to kill or acted with reckless indifference as a main participant in the criminal activities. Thus, Irwine contends, the jury was led to believe that the prosecutor did *not* need to prove that Irwine either intended to kill or was a major participant and acted with reckless indifference to human life in order to prove the special circumstance allegation.

### 3. Analysis

Besides the fact that it was Irwine who crafted and requested the instruction based on Modified 403 that he now contends interjected error, and did not object to the use of CALCRIM No. 703, his argument is meritless.[6]

In the first place, CALCRIM No. 703 was crystal clear that a nonkiller could not be liable for a special circumstance unless he was found to be a main participant in the

---

[6]  Respondent urges that Irwine should not be permitted to complain on appeal that the jury was confused by the instruction he proposed, because he invited any such error. (*People v. Seaton* (2001) 26 Cal.4th 598, 668.) The invited error doctrine, however, requires a showing that defense counsel both intentionally caused the trial court to err and that he did so for "tactical reasons" and not out of ignorance or mistake. (*People v. Harris* (2008) 43 Cal.4th 1269, 1293.) This showing has not been made.

felony and acted with reckless indifference to human life. CALCRIM No. 703, as given in this case, expressly provides: "If the defendant *was not the actual killer*, then the People have the burden of proving beyond a reasonable doubt that he acted with either the intent to kill or *with reckless indifference to human life and was a major participant in the crime for the special circumstances of Robbery, and/or Rape, and/or Forcible Oral Copulation to be true*. If the People have not met this burden, you must find this or these special circumstances have *not* been proved true for that defendant." (Italics added.)

Furthermore, Modified 403 and CALCRIM No. 703 plainly pertained to different parts of the jury's deliberations, so there is no likelihood the jury used Modified 403 to avoid the proper application of CALCRIM No. 703. The Modified 403 instruction obviously pertained to the jury's determination of whether Irwine committed an *underlying felony*: it stated it was an "instruction regarding aiding and abetting" that applied "only to his role in the robbery allegation, but not the rape and forcible oral copulation allegations," and that if the prosecutor did not prove a felony as a direct perpetrator or an aider and abettor, then the felony "cannot be used as *a basis to prove felony murder*, which is defined for you in another instruction." (Italics added.)

By contrast, the instruction based on CALCRIM No. 703 expressly applied to an entirely different jury task, much farther down the line in the jury's analysis, that arose only if the jury had *already* found that the defendant had not only participated in a felony, but was "guilty *of first degree murder*," and the jury was turning to the special circumstance allegations.[7]

Indeed, the trial court was careful to explain to the jury this very point—that the special circumstance instructions, including CALCRIM No. 703, had a distinct purpose. The court told the jury: "This next group of instructions relate to the special

---

[7]    Between the Modified 403 instruction regarding commission of the target offenses and the CALCRIM No. 703 instruction on special circumstances, the jury was given CALCRIM No. 540A, CALCRIM No. 540B, and other instructions that set forth its task in deciding whether Irwine was liable for felony murder in the first degree. Only after the jury determined that Irwine committed felony murder in the first degree would it turn to the special circumstance allegations and CALCRIM No. 703.

15

circumstances. So I'm noting these differences, because these *are different analyses that you have to go through for aiding and abetting for felony murder for determining what the underlying crimes are and now for the special circumstance. These are different things that you have to do, depending on what you find the facts to be*." (Italics added.) In addition, the verdict form for the special circumstances warned the jury: "Complete these special findings ONLY if you find the defendant Frank Irwine GUILTY of Murder."

Similarly, Modified 403 addressed a defendant's commission of the underlying *felony* as an aider and abettor; CALCRIM No. 703, by contrast, spoke of a defendant found guilty of "*first degree murder* as an aider and abettor" because he is "not the actual killer." The instruction specifying that Irwine was charged with the underlying felony of *rape or forcible oral copulation* as a direct perpetrator does not preclude the application of CALCRIM No. 703 to "a defendant who is not the actual killer, but who is guilty of *first degree murder* as an aider and abettor." (Italics added.) By their terms, the instructions pertained to different situations.

Under these circumstances, the jury would not have used Modified 403 to limit the application of CALCRIM No. 703. (See, e.g., *People v. Richardson* (2008) 43 Cal.4th 959, 1028 [we " 'must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given' "].)

Irwine fails to establish prejudicial error. As this is the only error he asserts in his appellate briefs, we will affirm the judgment as to Irwine and turn to the arguments of appellant Dailey.

B. <u>Causal and Temporal Connection Between Robbery and Murder</u>

For felony murder to arise, the killing must have been committed in the perpetration of the felony. For a killing to be deemed "committed in the perpetration of" an inherently dangerous felony for first degree felony murder, there must be a *causal* and *temporal* relationship between the underlying felony and the act resulting in death. (*Cavitt*, *supra,* 33 Cal.4th at p. 193.) Dailey contends there was insufficient evidence to

16

establish a causal and temporal connection between the robbery of Shavan at the ATM and her killing.

## 1. Causal Nexus

"The *causal* relationship is established by proof of a logical nexus, beyond mere coincidence of time and place, between the homicidal act and the underlying felony the nonkiller committed or attempted to commit."  (*Cavitt*, *supra*, 33 Cal.4th at p. 193.)

According to the prosecutor, the causal nexus was that (1) Dailey, Irwine, and Anderson participated in the robbery of Shavan at the ATM; (2) while maintaining control over Shavan, they participated in the rape and forcible oral copulation of Shavan; and (3) while still under the perpetrators' control, Shavan was killed by Irwine or Anderson.  According to the prosecutor, there was a causal connection and logical nexus between the robbery, the oral copulation, and the murder, since all of the crimes targeted *Shavan* as she remained under their control.

Substantial evidence supported the conclusion of a causal nexus.  Dailey, Irwine, and Anderson participated in the ATM robbery:  the surveillance video depicted Anderson and Dailey standing close to Shavan at the ATM, Dailey had his arm around Shavan's neck, Shavan was crying, Dailey pointed to the ATM screen, and Anderson snatched the money that Shavan withdrew; and Irwine was also at the scene (although off-camera) as shown by cell phone data and Dailey's account, was armed with a Taser (which Dailey said he saw), and may have been armed with the gun that was ultimately used to kill Shavan, based on his other armed robberies at financial institutions.  The jury could have further concluded that Shavan thereafter remained under the control of Dailey, Irwine, and Anderson until her death, because they were much larger than Shavan, Irwine and Anderson were armed, Dailey admitted that Shavan continued to look scared and appeared under their control, and Shavan went off with her robbers Irwine and Anderson to have sex, which, by Dailey's admission, she did not want to do.  (In addition, the prosecutor argued that Dailey exercised control over Shavan as her pimp, based on his refusal to elaborate on his "Chris Pimpme" caller I.D. and his statement that

17

she had had sex with Irwine and Anderson.)  The evidence suggested the oral copulation was forcible because Irwine's DNA was found in Shavan's mouth even though Shavan had said she would not perform oral sex.  And the killing—a bullet fired into Shavan's neck—and the dumping of her body in a recycling bin (which was reported missing from Anderson's apartment building and contained a blanket bearing Anderson's DNA) would have kept Shavan from reporting the trio's robbery and sex crimes.  Dailey's lie about whose arm was on Shavan's neck, and Dailey's and Irwine's lies about their location that night and not knowing Shavan, each other, or Anderson, further suggested their complicity.

In short, the robbery (and forcible oral copulation) and the killing were not mere coincidences of time and place.  (*Cavitt, supra*, 33 Cal.4th at p. 193, italics added.)

### 2.  Temporal Nexus

"The *temporal* relationship is established by proof the felony and the homicidal act were part of one continuous transaction."  (*Cavitt, supra*, 33 Cal.4th at p. 193.)

Former CALCRIM No. 549, given by the trial court, advised the jury of factors to consider in deciding whether the act causing the death and the felony were part of one continuous transaction:  "1. Whether the felony and the fatal act occurred at the same place; [¶] 2. The time period, if any, between the felony and the fatal act; [¶] 3. Whether the fatal act was committed for the purpose of aiding the commission of the felony or escape after the felony; [¶] 4. *Whether the fatal act occurred after the felony but while one or more of the perpetrators continued to exercise control over the person who was the target of the felony*; [¶] 5. Whether the fatal act occurred while the perpetrators were fleeing from the scene of the felony or otherwise *trying to prevent the discovery or reporting of the crime*; [¶] 6. Whether the felony was the direct cause of the death; [¶] AND [¶] 7. Whether the death was a natural and probable consequence of the felony."  (Italics added.)[8]

---

[8]     Dailey contends CALCRIM No. 549 was removed from CALCRIM in August 2013 due to the opinion in *Wilkins, supra*, 56 Cal.4th 333.  As we explain *ante*, however,

18

Dailey emphasizes that the robbery and the killing did not occur at the same place, and hours elapsed between the two events.  Nonetheless, substantial evidence supported the conclusion that the robbery and the fatal act were part of one continuous transaction, sufficient for establishing a temporal nexus.  As discussed *ante* in the context of a causal nexus, there was evidence from which the jury could reasonably infer that the killing of Shavan occurred while one or more of the robbery perpetrators—Dailey, Irwine, and Anderson—continued to exercise control over her.  In addition, the jury could reasonably conclude that the fatal act occurred because two of the perpetrators—Irwine and Anderson—were preventing Shavan from reporting the crimes that they and Dailey had inflicted.

### 3.  Jury's Special Circumstance Findings

Dailey urges that he and Irwine were not jointly engaged in any felony, and there was not the requisite nexus between the ATM robbery and the murder, in light of the jury's findings on the special circumstance allegations.  The jury found true the special circumstance that Dailey was engaged in the ATM robbery, but it did not find that special circumstance true as to Irwine; and although the jury found true the special circumstance that Irwine engaged in the later forcible oral copulation, it did not find that special circumstance true as to Dailey.  Because Dailey and Irwine were not jointly engaged in any felony prior to or at the time of Shavan's death, Dailey argues, Dailey cannot be liable for felony murder.  (Citing *People v. Martin* (1938) 12 Cal.2d 466, 472 (*Martin*); *People v. Perry* (1925) 195 Cal. 623, 637 (*Perry*).)

Dailey's argument is unpersuasive.  In the first place, the jury's special circumstance findings *cannot* be interpreted as a finding that Dailey was not a coparticipant with Irwine in the forcible oral copulation or that Irwine was not a

---

*Wilkins* did not hold that CALCRIM No. 549 was erroneous, at least as it might be applied in this case.  In any event, regardless of the viability of CALCRIM No. 549, Dailey does not dispute that a killing committed while a perpetrator continued to exercise control over the victim of a felony can, in the appropriate circumstance, reflect a continuous transaction sufficient to satisfy the temporal nexus requirement.

19

coparticipant with Dailey in the ATM robbery. To find that Dailey and Irwine committed the robbery or oral copulation felony, the jury could conclude they were either direct perpetrators or aiders and abettors. To find a special circumstance true for Dailey or Irwine, however, the jury would have to conclude that the defendant acted with an intent to kill or was a *major participant* in the underlying felony and acted with reckless indifference to human life. Given the evidence in this case, the jury could have reasonably decided that Dailey, although a direct perpetrator of the ATM robbery, was only an aider and abettor of the forcible oral copulation, and was therefore not a *major* participant in *that* crime. Accordingly, the jury would have found the oral copulation special circumstance allegation not true as to Dailey, even though it had found that Dailey had engaged in the oral copulation felony as an aider and abettor. Similarly, it would have found the ATM robbery special circumstance allegation not true as to Irwine, even though it found that Irwine had engaged in the robbery felony as an aider and abettor. As Dailey himself states in his reply brief: "The jury convicted one defendant of one special circumstance, based on his own personal acts, and then it convicted the other defendant of a separate special circumstance, based on his own and different individual acts."

Furthermore, even if there *were* an inconsistency between the felony-murder finding and the special circumstance finding, it would not warrant reversal of the felony-murder conviction. The pertinent question is whether there is *substantial evidence* to support the prosecutor's proposed causal and temporal nexus between the felony or felonies and the killing—and we conclude there was, as explained *ante*. An inconsistency in a jury's felony-murder verdict and another finding is immaterial, as it "may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict." (*People v. Lewis* (2001) 25 Cal.4th 610, 656; *People v. Pahl* (1991) 226 Cal.App.3d 1651, 1656; *People v. Lopez* (1982) 131 Cal.App.3d 565, 569-572 [rejecting claim that jury must have found defendant was an aider and abettor due to not true finding on weapon use allegation].) Dailey fails to establish error.

20

C. Felony-Murder Instructions

Dailey next contends the trial court's instructions on felony murder—particularly CALCRIM Nos. 540B and 549—were erroneous. Although Dailey's trial counsel did not object to the instructions, we will review them in light of several circumstances: the obligations of the trial court to instruct sua sponte on proximate cause, the permissibility of review under section 1259 of certain issues not raised in the trial court, and Dailey's contention that his trial counsel's failure to object constituted ineffective assistance of counsel. We begin with CALCRIM No. 540B.

1. CALCRIM No. 540B

The trial court instructed the jury with modified versions of CALCRIM No. 540B and other instructions pertaining to the liability of a defendant under a felony-murder theory where a coparticipant was the one who did the actual killing.

Based on CALCRIM No. 540B, the court instructed: "Both defendants are charged with murder, under a theory of felony murder. [¶] The defendants may be guilty of murder, under a theory of felony murder, even if another person did the act that resulted in the death. I will call the other person the perpetrator. [¶] To prove that a defendant is guilty of first degree murder under this theory, the People must prove that: [¶] 1. The defendant committed or aided and abetted Robbery, and/or Rape, and/or Forcible Oral Copulation; [¶] 2. The defendant intended to commit, or intended to aid and abet the perpetrator in committing, Robbery, and/or Rape, and/or Forcible Oral Copulation; [¶] 3. If the defendant did not personally commit Robbery, and/or Rape, and/or Forcible Oral Copulation, then a perpetrator, whom the defendant was aiding and abetting, personally committed Robbery, and/or Rape, and/or Forcible Oral Copulation; [¶] AND [¶] 4. While committing Robbery, and/or Rape, and/or Forcible Oral Copulation, the perpetrator caused the death of another person; [¶] AND [¶] 5. There was a logical connection between the cause of death and the Robbery, and/or Rape, and/or Forcible Oral Copulation. The connection between the cause of death and the Robbery,

21

and/or Rape, and/or Forcible Oral Copulation must involve more than just their occurrence at the same time and place."

Dailey contends the instructions were inadequate for two reasons.

### a. Requirement That Defendant and Killer Committed Same Felony

Dailey argues that the court's instructions, particularly CALCRIM No. 540B, were erroneous because they failed to require that the nonkiller and the killer be engaged in the *same* felony. Under the *Martin-Perry* formulation, he urges, the felony-murder rule applies only if the parties were "jointly engaged" in the perpetration of "the felony" at the time of the act resulting in death.

Dailey's argument is unavailing. First, paragraph No. 3 of CALCRIM No. 540B stated that, if the defendant did not personally commit robbery, rape, or forcible oral copulation, "then a perpetrator, whom the defendant was aiding and abetting," had to have personally committed robbery, rape, or forcible oral copulation. The implication is that the perpetrator and the defendant aiding and abetting him must have committed the same crime.

Second, whether or not it was clear from CALCRIM No. 540B that the perpetrator of the murder must have jointly engaged in the felony in which the defendant participated, it *was* clear from other instructions the court gave. (See *People v. Moore* (2011) 51 Cal.4th 1104, 1140 [court must evaluate instructions as a whole rather than a single, allegedly erroneous instruction in isolation].)

As given by the trial court, CALCRIM No. 401 told the jury that, to prove that a defendant is guilty of a crime (robbery, rape, or forcible oral copulation), the People would have to prove that "the perpetrator committed the crime" and the defendant intended to aid and abet, and did aid and abet, the perpetrator in committing "*the* crime." (Italics added.) In addition, the court instructed, although the prosecutor had presented evidence of more than one act to prove the defendants killed Shavan during the commission of a robbery, no responsibility for felony murder would arise unless the jury agreed on which act "*they* committed." (Italics added.) The upshot is that the defendants

22

would have to be jointly engaged in the same felony (such as the robbery they found Dailey to have committed) in order for felony murder to apply.[9]

Dailey fails to establish error.[10]

### b. *Logical Connection Between Dailey's Robbery and the Murder*

CALCRIM No. 540B instructed the jury that the prosecutor had to prove a "logical connection between the cause of death and the Robbery and/or Rape and/or Forcible Oral Copulation." Dailey contends this was insufficient, because it did not tell

---

[9]    We also note the clerk's transcript contains, as one of the instructions given to the jury, another instruction based on CALCRIM No. 403. This instruction advises the jury that, to prove Dailey was guilty of felony murder, the prosecution had to prove "[t]he defendant is guilty of Robbery and/or Rape and/or Forcible Oral Copulation" and, "[d]uring the commission of the Robbery and/or Rape and/or Forcible Oral Copulation, a *coparticipant* in *that* Robbery and/or Rape and/or Forcible Oral Copulation committed the crime of Murder." (Italics added.) The same instruction informed the jury: "If the Murder was committed for a reason independent of the *common plan* to commit the Robbery, and/or Rape, and/or Forcible Oral Copulation, then the commission of the Murder was not a natural and probable consequence of Robbery, and/or Rape, and/or Forcible Oral Copulation." (Italics added.) The instruction concluded: "If you decide that the defendant committed or aided and abetted one of these crimes and that Murder was a natural and probable consequence of *that* crime, the defendant is guilty of Murder. [¶] On the other hand, if the People have not proved beyond a reasonable doubt that the defendant is either a direct perpetrator or an aider and abettor of one of these crimes, and also that the Murder was a natural and probable consequence of *that* crime, the defendant is not guilty of Murder." (Italics added.) By stating that the defendant had to have committed robbery, rape or forcible oral copulation, and the "*coparticipant* in *that*" robbery, rape or forcible oral copulation had to have committed the murder "during" the commission of the felony, the instruction advises that the coparticipants had to be jointly engaged in the perpetration of the felony. As discussed *post*, however, there is a question whether the jury received this instruction, and we therefore do not rely on it in our analysis.

[10]    In his reply brief, Dailey argues that Modified 403 told the jurors that, if they found Dailey was an aider and abettor, they "need not agree about which of these crimes the defendant aided and abetted." He asserts this was erroneous, because it allowed the jury to convict Dailey if he aided and abetted one crime (robbery), even if the actual killers committed a homicide in the perpetration of another crime (forcible oral copulation). The argument is unavailing. First, it was not raised in the trial court; indeed, Dailey did not maintain any objection to the instruction. Second, as stated *ante*, the instructions as a whole addressed the issue adequately.

23

the jury it had to find a logical connection between the cause of death and the *specific* felony (or felonies) committed *by Dailey*. Dailey argues that *Cavitt* excludes from felony murder any "homicidal acts that are completely unrelated to the felony for which the parties have combined." (*Cavitt, supra,* 33 Cal.4th at p. 201.)

Dailey's argument is incorrect, because CALRIM No. 540B, taken in its entirety, makes it clear that a logical connection had to be found between the cause of death and the particular defendant's crime. CALCRIM No. 540B required, for a finding of felony murder, that "[t]he defendant committed or aided and abetted Robbery, and/or Rape, and/or Forcible Oral Copulation . . . [¶] AND [¶] [t]here was a logical connection between the cause of death and *the* Robbery, and/or Rape, and/or Forcible Oral Copulation . . . involv[ing] more than just their occurrence at the same time and place." (Italics added.) The use of the phrase "*the* Robbery, and/or Rape, and/or Forcible Oral Copulation" advised the jury that the logical connection had to be between the killing and the crime that the defendant committed.

### 2. CALCRIM No. 549

The court instructed the jury based on former CALCRIM No. 549, which set forth the one continuous transaction rule, with respect to the required temporal connection between the felony and the killing: "In order for the People to prove that the defendant is guilty of murder under a theory of felony murder and that the special circumstance of murder committed while engaged in the commission of Robbery, and/or Rape, and/or Forcible Oral Copulation is true, the People must prove that the Robbery, and/or Rape, and/or Forcible Oral Copulation, and the act causing the death were part of *one continuous transaction*. The continuous transaction may occur over a period of time and in more than one location. [¶] In deciding whether the act causing the death and the felony were part of one continuous transaction, you may consider the following factors: [¶] 1. Whether the felony and the fatal act occurred at the same place; [¶] 2. The time period, if any, between the felony and the fatal act; [¶] 3. Whether the fatal act was committed for the purpose of aiding the commission of the felony or escape after the

24

felony; [¶] 4. *Whether the fatal act occurred after the felony but while one or more of the perpetrators continued to exercise control over the person who was the target of the felony*; [¶] 5. Whether the fatal act occurred while the perpetrators were fleeing from the scene of the felony or otherwise *trying to prevent the discovery or reporting of the crime*; [¶] 6. Whether the felony was the direct cause of the death; [¶] AND [¶] 7. Whether the death was a natural and probable consequence of the felony. [¶] It is not required that the People prove any one of these factors or any particular combination of these factors. The factors are given to assist you in deciding whether the fatal act and the felony were part of one continuous transaction." (Italics added.)

Dailey contends this instruction was erroneous for three reasons.

### a. Revocation of the Instruction

CALCRIM No. 549 was revoked in August 2013. The Judicial Council's Advisory Committee on Criminal Jury Instructions provides the following explanation: "The Supreme Court recently clarified the temporal component necessary for liability for a death under the felony-murder rule. ([*Wilkins*, *supra*, 56 Cal.4th at p.] 344. ) In that case, the Supreme Court noted the limited usefulness of former CALCRIM No. 549, *Felony Murder, One Continuous Transaction—Defined*, which was based on the facts of [*Cavitt*, *supra*, 33 Cal.4th at p.] 208, in which a non-killer fled, leaving behind an accomplice who killed. ([]*Wilkins*, *supra*, at p. 342.) To avoid any potential confusion, the committee has deleted that instruction . . . ." (Judicial Council of Cal., Crim. Jury Instns. (2014) Introduction to Felony-Murder Series, p. 261.)

The trial court instructed the jury with CALCRIM No. 549 on September 25, 2013, after the committee had revoked the instruction and after our Supreme Court had decided *Wilkins*. But the giving of the instruction is not erroneous unless, as relevant to this case, it misstated the law or otherwise improperly misled the jury. It did not.

*Wilkins* involved the felony-murder liability of a defendant who, during flight from a felony he perpetrated against one person, killed another person. More particularly, the defendant had burglarized a house and loaded household appliances onto

25

the back of a pickup truck; hours later, as he was driving on a freeway, an unsecured stove stolen in the burglary fell off the truck, and another driver swerved to avoid it, crashed, and died. The court instructed the jury pursuant to former CALCRIM No. 549 that the burglary and the act causing the death must be part of one "continuous transaction," but refused the defendant's request for the jury to be instructed that the felony continues only until the perpetrator has reached a place of temporary safety (see CALCRIM No. 3261)—the so-called escape rule. (*Wilkins*, *supra*, 56 Cal.4th at pp. 337-340.)

*Wilkins* noted *Cavitt*'s statement that the escape rule was distinct from the continuous transaction doctrine defining the duration of felony-murder liability, "which may extend beyond the termination of the felony itself, provided that the felony and the act resulting in death constitute one continuous transaction." (*Wilkins*, *supra*, 56 Cal.4th at p. 342.) *Wilkins* did *not* question *Cavitt*'s depiction of the duration of felony-murder liability, or the irrelevance of the escape rule, where, as in *Cavitt*, the question was "a *nonkiller's* liability for the felony murder committed by another." (*Id*. at pp. 342, 344.) Instead, *Wilkins* held that, in cases "involving a *single* perpetrator," "when the killing occurs during the *flight* from a felony," the escape rule should be applied "to test the sufficiency of the evidence that a killing occurred in the commission of the felony." (*Id*. at p. 344, italics added.)

*Wilkins* is distinguishable from this case for two reasons. First, we are not concerned with the felony-murder liability of the actual *killer*. Second, we are not concerned with a felony-murder based on the theory that there was a continuous transaction because the killing occurred during the *flight* from a felony. Instead, we are concerned with the felony-murder liability of a *nonkiller* (as in *Cavitt*), where his accomplice in the felony took the life of the felony victim after continuing to maintain *control* over the same victim. (As such, this case involves factor No. 4 in former CALCRIM No. 549 rather than factor No. 5.) Whether Dailey obtained a place of temporary safety, or whether the robbery ended as *to him*, does not dictate his felony-murder liability.

26

Similarly, *Wilkins* did not consider, much less decide, whether an instruction with former CALCRIM No. 549 would be deficient under the circumstances of this case. (*Wilkins*, *supra*, 56 Cal.4th at pp. 348, fn. 4, 349-350.)  To the contrary, the court stated: "We express no opinion on whether CALCRIM No. 549 would be correct or complete when given in a case that did not raise an issue of the applicability of the escape rule." (*Id*. at p. 350, fn. 5.)  Moreover, the court's acceptance of *Cavitt* with respect to the felony-murder liability for a nonkiller suggests that former CALCRIM No. 549 would, in fact, be adequate under the circumstances before us.  Dailey fails to establish error.

### b.  Absence of Instruction Regarding Causal Nexus

Dailey further complains that the CALCRIM No. 549 instruction failed to tell the jury that it could not convict unless it found not just one continuous transaction (the temporal nexus), but also a *causal* nexus between the felony by Dailey and the killing.

The argument is meritless.  The jury *was* instructed of the need to find a causal nexus in the instruction given pursuant to CALCRIM *No. 540B*.  That instruction required, as the fifth of five necessary findings for felony murder, that "[t]here was *a logical connection between the cause of death and the Robbery, and/or Rape, and/or Forcible Oral Copulation.  The connection between the cause of death and the Robbery, and/or Rape, and/or Forcible Oral Copulation must involve more than just their occurrence at the same time and place*."  (Italics added.)  As we explained *ante*, CALCRIM No. 540B sufficed in that regard.  (See *Cavitt*, *supra*, 33 Cal.4th at p. 193 ["The causal relationship is established by proof of a logical nexus, beyond mere coincidence of time and place, between the homicidal act and the underlying felony the nonkiller committed or attempted to commit"].)

### c.  Insufficient Evidence of Continuous Transaction

Lastly, Dailey argues that the court's instruction with former CALCRIM No. 549 constituted error because there was insufficient evidence to support a finding of one continuous transaction.  (Citing, e.g., *People v. Smithey* (1999) 20 Cal.4th 936, 976; *People v. Hannon* (1977) 19 Cal.3d 588, 597.)

27

We disagree.  As set forth *ante*, there was substantial evidence that the ATM robbery committed by Dailey and the killing were all part of one continuous transaction: although the ATM robbery and the killing did not occur at the same place and time, it could reasonably be concluded that the killing occurred while one or more of the perpetrators (Irwine and Anderson at least) continued to exercise control over Shavan— the target of the earlier felonies—and the fatal act occurred while the perpetrators were trying to prevent the discovery or reporting of the robbery and sex crimes.

In sum, Dailey fails to establish error in the felony-murder instructions.

D.  Court's Response to Jury Inquiry About Felony Murder

During deliberations, the jury sent the court a note with two questions.  Dailey contends the court erred in responding to the second question.[11]

1.  Background

In its note, the jury inquired about the fourth element to be proven to find Dailey guilty of first degree felony murder under CALCRIM No. 540B:  "*While committing* Robbery, and/or Rape, and/or Forcible Oral Copulation, the perpetrator caused the death of another person."  (Italics added.)  Specifically, the jury asked:  "It says 'while committing . . . .'  What does 'while committing' mean?  Does it mean while you are in the act or during the act of robbery or other [*sic*] the death has occur[r]ed?"

The court discussed the question and potential responses with counsel; all agreed that the question pertained to the temporal relationship between the felony and the killing. The prosecutor suggested that the judge tell the jury to rely on the CALCRIM No. 549 instruction pertaining to the need for a continuous transaction, even though the instruction did not actually define "while committing" or "in the commission of." Dailey's attorney said a reply with the CALCRIM No. 549 continuous transaction

_____

[11]    The first question in the note read:  "To prove defendant guilty of first degree murder, do we have to prove <u>all</u> five clauses or is any one of them sufficient to prove defendant guilty[?]"  The court proposed a response that "all five of those factors have to be found," counsel for all parties agreed, and the court so advised the jury.  The court's response is not an issue here.

28

instruction "could be confusing" because it did not address the concept of "while committing," which simply means "while committing." As the discussion went on, Irwine's attorney proposed telling the jury to the effect that "you may find help and guidance in referring to section 549," and Dailey's attorney suggested that the jury be told that "while committing" does mean in the act or during the act of robbery, and "further clarification or analysis . . . you can find [in CALCRIM No.] 549." The prosecutor objected that the "plain meaning of 'while committing' is not the legal meaning of 'while committing.'" Ultimately, the court took a recess and presented counsel with a draft written answer. The court stated: "So I've tried to not direct them to anything, but depending on what they find the facts to be, the time frame may be broader than the literal meaning of the words. [¶] . . . [¶] *What do you guys think about this draft?* [¶] [Prosecutor]: I think it's good. [¶] [Dailey's Counsel]: *I'm fine with it.* [¶] . . . [Irwine's Counsel]: . . . I don't have any problem with it." (Italics added.)

The court then sent the response to the jury, which read as follows: "To find that a felony murder has been committed, you must find that the death was caused while a direct perpetrator or an aider and abettor was committing one of the underlying felonies alleged. *The concept of "while committing" or "During the commission" of the underlying felony may include a broader timeframe than the literal meaning of the words "while committing," depending on what you find the facts to be.* The instructions provide some guidance for making this determination, and *you are directed to carefully review instructions 540B and 549* and see if review of those instructions is helpful to you. [¶] If you need further assistance on this subject, please advise with another note." (Italics added.)

There is no indication the jury sent another note. About an hour later, the jury returned its verdict.[12]

---

[12] Respondent argues that Dailey waived this claim because his attorney agreed to the court's response, and any inadequacy in the court's response was a product of invited error. (Citing *People v. Bunyard* (1988) 45 Cal.3d 1189, 1234.) Dailey argues that Dailey's counsel had already objected to parts of this proposed instruction, and the court

## 2. Court's Referral to CALCRIM Nos. 540B and 549

Dailey contends the court's referral of the jury to CALCRIM No. 540B and former CALCRIM No. 549 was error because of the deficiencies he sees in those instructions, as addressed *ante*. We have already rejected Dailey's arguments in that regard.

## 3. Requirement That Killing Occurred During Dailey's Felony

Dailey next contends the part of the court's response that told the jury "you must find that the death was caused while a direct perpetrator or an aider and abettor was committing one of the underlying felonies alleged" was defective because it did not say the jury had to find that *Dailey was still engaged in the commission of a felony* at the time of the killing. It therefore allowed the jury to convict Dailey of felony murder even if he was no longer engaged in a felony at the time of the killing, as long as one of the codefendants was still engaged in *any* charged felony. Similarly, he urges that the court's response failed to inform the jury of the requirement that the defendant (Dailey) and the actual killer must have been engaged in the *same* felony at the time of the killing. As discussed *ante*, however, the court's instructions as a whole, including CALCRIM Nos. 403 and 540B, satisfied this requirement.

## 4. Overbreadth

Finally, Dailey contends the court erred by stating that "[t]he concept of 'while committing' or '[d]uring the commission' of the underlying felony may include a broader timeframe than the literal meaning of the words 'while committing,' depending on what you find the facts to be." He urges that the statement violates the principle that words are to be interpreted in their plain and ordinary meaning. That principle sometimes applies to words in statutes and contracts; however, Dailey provides no authority that it must be applied to jury instructions.

---

effectively overruled them, obviating the need for the objections to be repeated. This is incorrect. Dailey further argues (1) correct instructions on proximate cause must be given sua sponte, and (2) section 1259 allows instructional errors to be challenged on appeal even if trial counsel does not adequately object. He also asserts that, if the error is deemed waived or invited error, trial counsel provided ineffective assistance.

Dailey further argues that the court's statement was overbroad and indefinite, allowing the jury to determine the time period in which Dailey remained liable for the ATM robbery, and thus undermining the requirement of a causal and temporal nexus between the defendant's felony and the homicide. Not so. The court told the jury that, in making that determination, the jury should refer to "instructions 540B and 549," and those instructions required a causal nexus and continuous transaction (temporal nexus).

E. Lack of Instruction on Second Degree Murder

Dailey next contends the court had a sua sponte duty to instruct the jury on second degree murder, even in this felony-murder case, because the accusatory pleading alleged that Dailey committed murder "with malice aforethought."

1. Background

The first paragraph of the amended information alleged: "The District Attorney of the County of Alameda by this Information hereby accuses Frank Bernard Irwine, Kristian Tyrone Dailey and Terrance Juan Anderson of a Felony, to wit: Murder, a violation of section 187(a) of the Penal Code . . . , in that between November 2, 2006 and November 4, 2006, in the County of Alameda . . . , said defendant(s) did unlawfully, and *with malice aforethought*, murder Shavan Boone, a human being." (Italics added.)

At trial, the court asked whether any counsel was requesting instructions on a lesser degree of homicide. Dailey's counsel said no. Irwine's counsel requested an instruction on second degree murder, which the court denied because it would interfere with the prosecutor's choice to proceed on a felony-murder theory. The court invited counsel that if they found any further authority on the topic, they should submit it to him by e-mail, but the record does not indicate that any further authorities were submitted.

The jury was instructed on first degree felony murder, but not on second degree murder or any other lesser degree of homicide.

2. Law

A trial court must instruct sua sponte on lesser included offenses if there is substantial evidence supporting the conclusion that the defendant committed only the

lesser crime. (*People v. Anderson* (2011) 51 Cal.4th 989, 997; *People v. Wyatt* (2012) 55 Cal.4th 694, 698.) The court's instructional duties in this regard may be based on the elements of the respective crimes or the facts alleged in the accusatory pleading. (*People v. Smith* (2013) 57 Cal.4th 232, 240.)

In *People v. Banks* (2014) 59 Cal.4th 1113, 1157-1162 (*Banks*), overruled on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3, the accusatory pleading alleged that the defendant committed murder "with malice aforethought" and further alleged that the murder occurred while the defendant was engaged in the commission of an attempted robbery. Under the accusatory pleading test, our Supreme Court held that the trial court should have instructed the jury on second degree murder as a lesser included offense (even though the prosecutor was proceeding solely on a felony-murder basis and defense counsel did not want the instruction), since there was substantial evidence that the defendant committed the lesser offense without committing the greater. (*Banks*, 59 Cal.4th at pp. 1159-1160 ["Here, under the accusatory pleading test, second degree murder was plainly a lesser included offense of felony murder *as charged* in count 8"]; see *People v. Anderson* (2006) 141 Cal.App.4th 430, 445.) Respondent's brief does not distinguish *Banks*, 59 Cal.4th 1113.

### 3. Analysis

Dailey contends there was substantial evidence that the crime was no worse than second degree murder: there was no evidence of premeditation and deliberation, and there was substantial evidence that Dailey was not involved in any robbery, at least at the time of Shavan's death. Therefore, Dailey argues, the instruction on second degree murder should have been given.

The question, however, is whether Dailey has posited any theory consistent with the evidence that would have allowed the jury to convict him of second degree murder. (*People v. Valdez* (2004) 32 Cal.4th 73, 115 (*Valdez*).) Under a felony-murder theory, the only possible outcome would be first degree murder or acquittal, because the alleged felonies were all listed in section 189. Under a malice-murder theory, there was no

evidence that Dailey actually killed Shavan or aided and abetted her *killing*. Thus, regardless of Irwine's and Anderson's states of mind when Shavan was killed, Dailey does not present a scenario in which the jury would have concluded, if instructed on second degree murder, that Dailey had committed second degree murder.

Accordingly, the failure to instruct sua sponte on second degree murder was not erroneous. (*Valdez*, *supra*, 32 Cal.4th at p. 115) [although trial court must instruct sua sponte on second degree murder in felony-murder case if there was substantial evidence that only the lesser crime was committed, there is no error in the absence of such substantial evidence].)[13]

F. Instruction on Intervening or Superseding Cause

Between the time of the ATM robbery and the murder several hours later, Irwine had sex with Shavan. Because there was no evidence Dailey personally participated in, or was present at, the sex or the murder, Dailey contends the court should have instructed sua sponte that Dailey would not be liable for the murder if the sexual crimes constituted an intervening or superseding cause of the murder.

1. Law

An intervening cause is one that contributes to the result that was caused by the defendant's act. If the intervening cause is a normal and reasonably foreseeable result of the defendant's act, it is deemed "dependent" and will not relieve defendant of liability.

---

[13]    In *Banks, supra*, 59 Cal.4th 1113, the court found the failure to instruct on second degree murder harmless under *People v. Watson* (1956) 46 Cal.2d 818, 837, noting that evidence sufficient to warrant an instruction on a lesser included offense does not necessarily amount to evidence sufficient to create a reasonable probability of a different outcome had the instruction been given. (*Banks*, 59 Cal.4th at p. 1161.) Dailey contends the correct standard of prejudice for failure to instruct on a necessary included offense is the harmless beyond a reasonable doubt test under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), because the error violates constitutional due process. (Citing *Middleton v. McNeil* (2004) 541 U.S. 433; *People v. Thomas* (2013) 218 Cal.App.4th 630, 646.) We need not determine the appropriate standard for harmless error, because we find no error. But for the same reason there was no error—that is, the impossibility of a second degree murder conviction given the evidence—any such error would have been harmless under either *Watson* or *Chapman*.

(*People v. Mejia* (2012) 211 Cal.App.4th 586, 609 (*Mejia*) ["it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act"]; *People v. Cervantes* (2001) 26 Cal.4th 860, 871 (*Cervantes*).) But if the intervening cause was "unforeseeable . . . [,] an extraordinary and abnormal occurrence," it is deemed independent and "rises to the level of an exonerating, superseding cause." (*Mejia*, at p. 609; *Cervantes*, at p. 871; see *People v. Funes* (1994) 23 Cal.App.4th 1506, 1523; *People v. Schmies* (1996) 44 Cal.App.4th 38, 52.)

In short, if the intervening cause was not foreseeable *and* causes harm that was not the foreseeable result of the defendant's conduct, the defendant is relieved from liability. (*People v. Fiu* (2008) 165 Cal.App.4th 360, 371 (*Fiu*); *People v. Brady* (2005) 129 Cal.App.4th 1314, 1326 (*Brady*).)

A trial court has the sua sponte duty to instruct on a superseding cause if called for by the facts of the case. (*Fiu*, *supra,* 165 Cal.App.4th at p. 372.) The jury instructions to be given in a criminal case on intervening cause, when appropriate and with modifications as needed in the case, are set forth in CACI Nos. 431 and 432. (*Brady*, *supra*, 129 Cal.App.4th at p. 1328.)

2. Evidence of Independent Intervening (Superseding) Cause

Neither party discusses whether there was substantial evidence to support the conclusion that Irwine's sex crimes were an independent intervening cause of Shavan's death. However, we glean from Dailey's arguments elsewhere in his appellate briefs that, since it was the prosecution's theory that Shavan accompanied Irwine and Anderson in order to have *consensual* sex, it was not foreseeable to Dailey that *illegal* sexual activities, much less murder, would occur. Although we do not necessarily agree with that proposition, respondent does not dispute there was sufficient evidence to support an instruction on intervening cause. Instead, respondent argues that the instruction on CALCRIM No. 403 adequately addressed the issue.

### 3. Sufficiency of CALCRIM No. 403

Respondent points out that, under CALCRIM No. 403, a felony-murder finding required that the killing had to be a natural and probable consequence of the robbery, rape, or forcible oral copulation, and a natural and probable consequence was defined as "one that a reasonable person would know is likely to happen if nothing unusual intervenes." Respondent argues that CALCRIM No. 403 therefore encompasses the principles of foreseeability that cover superseding causation, even if the instruction does not mention intervening causes.[14] (Citing, e.g., *Fiu*, *supra*, 165 Cal.App.4th at pp. 371-372.)

Dailey does not dispute that the jury was instructed with this language. Instead he counters that the sentence in CALCRIM No. 403—"A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes"—was inadequate, because it did not define intervening or superseding cause, adequately discuss the concept of foreseeability, or tell the jury to determine whether a reasonable person in Dailey's position could foresee that a criminal sexual assault or murder would occur.

Whether or not CALCRIM No. 403 specifically addresses the issue of intervening causes, it would lead to the conclusion that any error in not instructing on intervening cause was harmless.

CALCRIM No. 403 states that (1) the prosecutor had to prove "a reasonable person in the defendant's position would have known that the commission of the Murder was a natural and probable consequence of" the underlying felony; (2) a "natural and probable consequence is one that a *reasonable person would know is likely to happen if*

---

[14]     Respondent further argues that, since Dailey did not object to the proximate cause instructions, propose any clarification or addition to CALCRIM No. 403, or request instructions on intervening cause, he is precluded from claiming it was incomplete or insufficient. (Citing *People v. Daya* (1994) 29 Cal.App.4th 697, 714.) Dailey argues, however, that he may still raise these issues on appeal because correct instructions on proximate cause must be given sua sponte and because section 1259 allows instructional errors to be challenged on appeal even if trial counsel had not objected.

35

*nothing unusual intervenes*"; and (3) the murder was not a natural and probable consequence of the felony if it was "committed for a reason *independent of the common plan* to commit the [felony]." Therefore, in convicting Dailey of felony murder, the jury must have found that the murder was *not* committed for a reason independent of the common plan and *was* a reasonably foreseeable consequence of his felony. In light of those findings, the jury would not have found that the forcible oral copulation was an *independent* intervening cause relieving Dailey of liability for Shavan's death, even if the jury had been instructed on intervening causes. Nor is there any indication that, if the instruction on intervening causes was given to the jury, the jury would have decided matters differently under CALCRIM No. 403.

Although not raised by Dailey or respondent, there is some question whether the jury was actually instructed with the cited language from CALCRIM No. 403. While the language does appear in a CALCRIM No. 403 instruction contained in the clerk's transcript as part of the instructions given to the jury, we do not find the language in the reporter's transcript of the instructions the court gave to the jury orally. Moreover, the reporter's transcript indicates the court's intention to replace the original CALCRIM No. 403 instruction (containing this language) with the Modified 403 instruction (omitting this language).

At any rate, the absence of an intervening cause instruction would be harmless for another reason. The jury was instructed, pursuant to CALCRIM No. 549, that the felony and the murder had to be part of one continuous transaction. Indeed, Dailey's counsel argued to the jury, without objection, that if the killing happened outside the transaction of the felony—or was something Dailey did not "sign up for"—Dailey would not be responsible for the killing of Shavan under the felony-murder rule. Counsel argued repeatedly and at length that there was no continuous transaction between the robbery at the ATM and Shavan's killing. Because the jury necessarily found that Dailey's robbery of Shavan at the ATM and her killing *were* part of one continuous transaction, there is no likelihood that it would have found any supervening cause of her death.

36

The failure to give an intervening cause instruction, if it was error, was harmless beyond a reasonable doubt.

### G. Prosecutor's Argument Regarding Motive

Dailey contends the court improperly allowed the prosecutor to argue that Dailey and Irwine's unemployment gave them a motive to rob Shavan.

#### 1. Background

During closing argument, the prosecutor discussed statements that Dailey and Irwine had made to the police and the significance of their lies and deflections. In the midst of this discussion, the prosecutor stated, "Neither of them had jobs at the time in 2006, giving them both a motive to commit robbery." The prosecutor did not expressly argue, however, that the jury should find the robbery occurred because of that motive. Neither Irwine nor Dailey objected to the prosecutor's statement.

During rebuttal argument, the prosecutor argued, among other things, that each of 26 items of evidence linking Dailey, Irwine, and Anderson to the crimes could just be viewed as mere "coincidence," but it would be unreasonable to reach that conclusion. In this context, the prosecutor stated, "You could find it's just a coincidence that Kristian Dailey and Frank Irwine both had no job and had a motive to rob Shavan Boone." Again, the prosecutor did not actually argue that the robbery was proved by this motive. Nor did Irwine or Dailey make a contemporaneous objection to the prosecutor's comment.

At a sidebar conference after the prosecutor concluded her rebuttal argument, however, *Irwine's* counsel asserted it was improper for the prosecutor to argue that his client was unemployed as a motive or evidence that he would commit a robbery, and he requested an admonition be given to the jury. The court overruled the objection and declined to admonish the jury.

As one of the general jury instructions delivered in the ordinary course of the trial, the court instructed with CALCRIM No. 370, which told the jury: "The People are not required to prove that a defendant had a motive to commit any of the crimes charged. In reaching your verdict you may, however, consider whether the defendant had a motive.

37

[¶] Having a motive may be a factor tending to show that a defendant is guilty.  Not having a motive may be a factor tending to show a defendant is not guilty."

### 2. Law

Dailey points out that evidence of a defendant's poverty or indebtedness is generally inadmissible to establish a motive to commit robbery, because reliance on poverty alone as evidence of motive is deemed unfair to the defendant, and the probative value of such evidence is likely outweighed by the risk of prejudice.  (*People v. Wilson* (1992) 3 Cal.4th 926, 938-939.)[15]

### 3. Waiver

To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely objection, make known the basis of the objection, and ask the court to admonish the jury.  (*People v. Brown* (2003) 31 Cal.4th 518, 553.)  Here, Dailey's trial attorney never objected to either of the prosecutor's comments.  (*Koontz*, *supra*, 27 Cal.4th at p. 1076 [failure to object to prosecutor's elicitation of information concerning defendant's earnings and assets forfeited appellate challenge].)

Dailey points us to an in limine ruling that an objection by one defendant would constitute an objection by all defendants, unless noted otherwise.  Even if the objection by Irwine's counsel counted as an objection for Dailey, Irwine's attorney objected only to the second of the prosecutor's references, and even that objection was not contemporaneous.  Dailey nonetheless maintains that an admonition in response to Irwine's counsel's objection would have cured both instances of prosecutorial misconduct.  Dailey makes a colorable argument, and we will proceed to the merits.

---

15       "[E]vidence of a defendant's poverty is admissible for the limited purpose of refuting a claim that he did not commit the offense because he did not need the money, or to eliminate other possible explanations for sudden wealth after the occurrence of a theft offense.  [Citations.]"  (*People v. Koontz* (2002) 27 Cal.4th 1041, 1076 (*Koontz*).)  Respondent does not argue that this exception applies here.

#### 4. Any Error Was Harmless

Respondent does not dispute that the prosecutor's references constituted prosecutorial misconduct, or that the court should have admonished the jury not to consider Dailey's unemployment in deciding whether he committed a robbery.

Assuming the prosecutor's references constituted misconduct, or the court erred in failing to admonish the jury, reversal is not required because it is not reasonably probable that a result more favorable to Dailey would have occurred. (See *People v. Welch* (1999) 20 Cal.4th 701, 753.)

The prosecutor stated that Dailey and Irwine had a motive to rob Shavan due to their unemployment, which is less prejudicial than arguing it was due to their poverty or indebtedness. Moreover, the prosecutor's references to Dailey's unemployment were brief, and the prosecutor made virtually no effort to convince the jury that it should find he committed robbery due to this motive. Nor did she have to, in light of the overwhelming evidence—including the ATM surveillance video—of Dailey's guilt.

Dailey's arguments to the contrary are unavailing. First, he likens this matter to *People v. Garcia* (2014) 229 Cal.App.4th 302, 312-317 (*Garcia*). There, the prosecutor repeatedly attempted to introduce evidence that the defendant was a lesbian in order to prove that she sexually abused a girl she babysat. In closing argument, the prosecutor "repeatedly urged the jury to consider [the defendant's] sexual orientation in deciding the truth of the charges against her," claiming that the defendant's motive was her attraction to females. The prosecutor then spent "a good part of her rebuttal argument" asserting that the defendant looked like a lesbian in her booking photo. She told the jury, "And the defendant is charged with sexually molesting a female child, so her sexual orientation and whether or not she's ever had a boyfriend or whether or not she's attracted to females or whether or not she looks like this when she's arrested and then looks like that for trial is absolutely relevant." The jury found the defendant guilty. (*Id*. at pp. 309-310.)

The appellate court in *Garcia* concluded that the evidence of the defendant's sexual orientation was irrelevant, and the prosecutor's assertion to the contrary was "a prominent component of her closing argument," contrary to the rule that a prosecutor

may not rely on misleading or spurious arguments to obtain a conviction. (*Garcia*, *supra*, 229 Cal.App.4th at pp. 314, 316.) Furthermore, the prosecutor's conduct infected the trial with such unfairness as to render the conviction a violation of due process, and because the misconduct undermined the defendant's federal constitutional rights, reversal was required unless the misconduct was harmless beyond a reasonable doubt. (*Id*. at pp. 317-318.) The court reversed. (*Id*. at p. 318.)

*Garcia* is distinguishable on many grounds. In *Garcia*, the prosecutor used inflammatory statements concerning the defendant's sexual orientation in order to exploit the misconception that homosexuality is related to pedophilia; here, the prosecutor said Dailey did not have a job. In *Garcia*, the prosecutor's attack was a prominent component of her closing argument and a good part of her rebuttal argument; here, the prosecutor mentioned Dailey's unemployment in two short sentences buried in pages and pages of closing argument transcript. In *Garcia*, the prosecutor's barrage of inflammatory comments was so severe that it undermined the defendant's constitutional rights, thus implicating the standard of harmless beyond a reasonable doubt; here, it did not.

Next, Dailey argues that, without the prosecutor's two statements about Dailey's motive, there could have been a reasonable doubt as to whether a robbery occurred or whether Dailey participated in it: Dailey told police that Shavan was obtaining the money for her own personal use or to pay a pimp, and the ATM video showed Shavan handing the money to Anderson. But this evidence actually shows that the jury's basis for finding that Dailey committed robbery was *not* because he (or Irwine) was unemployed or poor. Since Shavan handed the money to *Anderson*, it would make no sense to conclude that Dailey robbed Shavan because Dailey or Irwine was poor.

H. Substantial Evidence of Robbery Special Circumstance

We now turn to the first contention in the final set of Dailey's arguments, pertaining to the jury's special circumstance findings.

Because the prosecution did not assert that Dailey had personally killed Shavan or intended to kill her, the prosecution could establish the robbery special circumstance

40

against Dailey only by proving that he acted "with reckless indifference to human life" and was a "major participant." (§ 190.2, subds. (c) & (d); *Estrada*, *supra*, 11 Cal.4th at pp. 571-572.) To this end, the jury was instructed consistent with CALCRIM No. 703, which informed the jury that the special circumstance allegation would be untrue unless it found (1) Dailey's participation in the crime began before or during the killing, (2) he was a *major participant* in the crime, and (3) when he participated in the crime he acted with *reckless indifference to human life*. Dailey contends there was insufficient evidence to support the required findings.

### 1. Reckless Indifference to Human Life

As the jury was instructed, a person acts with reckless indifference to human life if he or she "knowingly engages in criminal activity that he or she knows involves a grave risk of death." (CALCRIM No. 703; see *People v. Mil* (2012) 53 Cal.4th 400, 417, quoting *Estrada*, *supra*, 11 Cal.4th at p. 577 [" 'This mental state thus requires the defendant be 'subjectively aware that his or her participation in the felony involved a grave risk of death' "].)

Substantial evidence supported a finding that Dailey knowingly engaged in criminal activity that he knew involved a grave risk of death. Dailey perpetrated the ATM robbery (as shown by the ATM video), and he was obviously aware of and involved in the violent manner of the offense. He knew that Shavan was afraid, that she went off with Irwine and Anderson, and that she had sex with them—which he acknowledged to police she did not want. (Under the prosecutor's theory, Dailey dispatched Shavan to have sex with them, acting as her pimp or wannabe pimp.) And he knew she was going off with Irwine and Anderson in a situation that, in his words, "did not look good." It was past 2:00 in the morning, Irwine and Anderson were much larger than Shavan, Dailey admitted he saw Irwine's Taser, there was evidence from which the jury could conclude that Irwine also had a gun, and Dailey stated that Shavan was under Irwine's and Anderson's control. By forcing her to withdraw her money from the ATM—such that she would be, in his words, "more of an asset or valuable" to Irwine and

41

Anderson—Dailey set in motion a chain of events that, by nearly his own admission, involved a grave risk of death. And despite knowing of this danger, he pursued the robbery and subsequent exercise of control over Shavan rather than come to her aid. (See, e.g., *People v. Smith* (2005) 135 Cal.App.4th 914, 927-928.)[16]

Dailey argues that there was no direct evidence that he had a weapon, knew Irwine or Anderson had a weapon, personally inflicted great bodily injury, or was present at the scene of Shavan's murder. He claims there is no reported case upholding a finding of "reckless indifference to human life" in these circumstances.

The absence of a case on point, however, does not compel the conclusion that the evidence was insufficient. Certainly the prosecutor relied on circumstantial evidence, and not every jury would necessarily draw the same inferences from that evidence. Nonetheless, the evidence was such that a jury *could* reasonably conclude that the prosecutor's theory was correct, and that Dailey harbored a reckless indifference to human life. (See *People v. Proby* (1998) 60 Cal.App.4th 922, 928 (*Proby*) [appellate court reviewing for substantial evidence must presume in support of judgment every fact jury could reasonably deduce from evidence].)

### 2. Major Participant

CALCRIM No. 703 does not define the requirement that the defendant be found to be a "major participant in the crime." Nor does Dailey assert it should. He contends instead that the evidence was insufficient to show that he was.

Years after the jury rendered its verdict in this case, our Supreme Court issued its decision in *Banks*, 61 Cal.4th 788. There, the jury had found true a felony-murder special circumstance based on evidence that the defendant was a getaway driver for an armed robbery in which a guard was killed.

---

[16] The risk of death inherent in an unarmed robbery does not, *in itself*, support a special circumstance finding for a defendant who participated in the crime. (*People v. Banks* (2015) 61 Cal.4th 788, 808 (*Banks*).) Furthermore, knowledge that one's accomplice is armed does not, *in itself*, establish reckless indifference to human life. (*Id.* at p. 809, fn. 8.) But where, as here, these facts are complemented by other significant facts, reckless indifference to human life may be found. (See *ibid.*)

42

In considering whether the defendant was a "major participant" in the criminal activities, the court concluded that the term should be understood as it is commonly used, such that the "defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder." (*Banks*, *supra*, 61 Cal.4th at pp. 801-802; see *Proby*, *supra*, 60 Cal.App.4th at pp. 933-934 ["major participant" understood in its common usage, and includes involvement that is "notable or conspicuous in effect or scope" and persons who are more important members of a group].) In making this determination, the jury must consider the totality of the circumstances. (*Banks*, 61 Cal.4th at p. 802.)

The court *in Banks* then identified factors that may help prove or disprove whether a nonkiller was a "major participant": "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? *No one of these considerations is necessary*, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major' [citations]." (*Banks*, *supra*, 61 Cal.4th at p. 803, italics added.)

Applying these principles, *Banks* concluded that the evidence was insufficient to find that the defendant getaway driver was a major participant. He dropped off his confederates and waited three blocks away. No evidence established that he had a role in planning the robbery or procuring weapons, or that he or his cohorts had previously committed murder or other violent crime. During the robbery and the murder, he was absent from the scene, sitting in a car and waiting. In short, he was no more than a

43

getaway driver. (*Banks*, *supra*, 61 Cal.4th at p. 805.) Dailey argues that he also had no role in planning the criminal enterprise, supplying lethal weapons, and the like.

But Dailey was no mere getaway driver. He was a major participant—if not the ringleader—in the robbery of Shavan at the ATM. The ATM video showed *Dailey* was the direct perpetrator of the robbery and present at the scene; *he* accompanied her to the ATM; *he* had his arm around Shavan's neck when she was making her ATM withdrawal; and *he* was pointing to the ATM screen. Moreover, there was evidence that he played a significant role in the rest of the criminal activities. If the jury accepted the prosecutor's theory, Dailey, as Shavan's pimp or wannabe pimp, helped to dictate that Shavan go with her robbers Irwine and Anderson; Dailey therefore allowed if not orchestrated the sex, and greatly increased her vulnerability even though he was not present for the ensuing crimes. But even without the pimp theory, evidence suggesting Dailey's complicity included the fact that Irwine and Anderson, after sex with Shavan, returned with her to *Dailey's* location and socialized with him before taking Shavan to East Oakland and her demise. Dailey also knew to go to the area in East Oakland where Shavan's body was found, on the morning of her death; and he spontaneously told police he would take a gun residue test, even though police had not disclosed the manner in which she was killed. Unlike a getaway driver, Dailey did not merely put people into physical position, but ignited the fuse that ultimately led to Shavan's death, and fanned the flame along the way. While the evidence may be susceptible of different inferences, there was substantial evidence from which to conclude that he was a major participant in the criminal activities that he knew carried a grave risk of death.

I. Substantial Evidence of Robbery Special Circumstance (Argument Two)

Dailey incorporates his prior arguments (insufficient causal and temporal nexus between the ATM robbery and the killing, and insufficient evidence of a special circumstance), to argue that there was no causal and temporal relationship between the ATM robbery and the murder to support a finding of the robbery special circumstance. For the reasons we reject his arguments *ante*, we reject them here.

44

J. Instruction Defining Reckless Indifference to Human Life

Dailey contends the special circumstance instruction (CALCRIM No. 703) was defective because it did not forbid the jury from finding "reckless indifference to human life" as to a nonkiller defendant who was absent from the homicide scene, did not personally inflict great bodily injury, was not armed, did not know his confederates were armed, and did not collaborate in a scheme designed to kill. He urges that the court should have instructed the jury sua sponte on these principles, and trial counsel rendered ineffective assistance by failing to request such an instruction.

1. Waiver

The court's standard special circumstance instruction under CALCRIM No. 703 advised of the reckless indifference to human life requirement and that such indifference arises if the person "knowingly engages in criminal activity that he or she knows involves a grave risk of death." Dailey did not request any amplification or clarification of the instruction. He therefore waived and forfeited his contention that an amplification or clarification should have been made. (See, e.g., *People v. Souza* (2012) 54 Cal.4th 90, 120; *People v. Spurlock* (2003) 114 Cal.App.4th 1122, 1130 [party may not complain on appeal that legally correct instruction, responsive to the evidence, was too general or incomplete unless party requested clarifying or amplifying language].)

2. No Error

CALCRIM No. 703, as given in this case, provides that a person acts with reckless indifference to human life if he or she "knowingly engages in criminal activity that he or she knows involves a grave risk of death." That is an accurate statement of the law. (*Estrada*, *supra*, 11 Cal.4th at p. 577; *Tison v. Arizona* (1987) 481 U.S. 137, 157.)

Although Dailey claims that evidence such as his absence from the homicide scene and other matters preclude a finding of reckless indifference, he provides no authority for the proposition that a reckless indifference finding in those circumstances would be forbidden *as a matter of law*. The court's instruction properly left to the jury the

45

determination of the underlying facts and provided them with sufficient guidance to make a finding with respect to the element of reckless indifference to human life.

### 3. No Ineffective Assistance of Counsel

In light of the sufficiency of the CALCRIM No. 703 instruction, Dailey's contention that his trial counsel was ineffective for failing to request a modification of the instruction is unavailing. It was neither incompetent nor prejudicial to allow the jury to be instructed in the language embraced by the statute, recommended by the standard jury instruction, and approved by our Supreme Court in *Estrada*.

### K. Cumulative Error

Dailey contends the combination of the errors he has asserted requires reversal. He is incorrect. We find no errors, with the possible exception of one or two that were harmless. In the final analysis, Dailey received a fair trial.

The judgment as to Dailey, like the judgment as to Irwine, will be affirmed.

### III. DISPOSITION

The judgment is affirmed.

NEEDHAM, J.

We concur.

SIMONS, ACTING P.J.

BRUINIERS, J.

46